UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
BANK OF NEW YORK,                       :
                                        :    05 CIV. 4926 (DLC)
                     Plaintiff,         :
                                        :    <u>OPINION & ORDER</u>
          -v-                           :
                                        :
JENNY RUBIN, DEBORAH RUBIN, DANIEL      :
MILLER, ABRAHAM MENDELSON, STUART       :
HERSCH, RENAY FRYM, NOAM ROZENMAN,      :
ELENA ROZENMAN, TZVI ROZENMAN, BANK     :
MELLI IRAN NEW YORK REPRESENTATIVE      :
OFFICE, BANK SADERAT IRAN NEW YORK      :
REPRESENTATIVE OFFICE, BANK SADERAT     :
IRAN DUBAI BRANCH, BANK SEPAH IRAN NEW  :
YORK REPRESENTATIVE OFFICE and ARAB     :
BANK FOR INVESTMENT AND FOREIGN TRADE,  :
                                        :
                     Defendants.        :
                                        :
----------------------------------------X

Appearances:

For Plaintiffs:
Leo T. Crowley
Daniel Z. Mollin
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036

For Rubin Defendants:
Robert J. Tolchin
Jaroslawicz & Jaros
150 William Street, 19th Floor
New York, NY 10038

For Defendant Bank Melli:
John D. Winter
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

For the United States:
Lara Eshkenazi
Assistant United States Attorney
86 Chambers Street
New York, NY 10007

DENISE COTE, District Judge:

Plaintiff Bank of New York brings this interpleader action to relieve itself of liability for funds it holds on behalf of several of the bank defendants. Interpleader-defendant Bank Melli moves to dismiss plaintiff's complaint on the ground that the competing claims to its funds are without merit. Since interpleader relief would be appropriate and the complaint is not properly dismissed for failure to state a claim, Bank Melli's motion is recharacterized as a motion for judgment on the pleadings for a determination of the respective rights of the interpleader defendants. That motion is granted.

BACKGROUND

A. Underlying Action

Individual defendants Jenny Rubin, Deborah Rubin, Daniel Miller, Abraham Mendelson, Stuart E. Hersch, Renay Frym, Noam Rozenman, Elena Rozenman, and Tzvi Rozenman (collectively, the "Rubin defendants") brought suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601 et seq., against the Islamic Republic of Iran and other Iranian government defendants in connection with a terrorist attack at an outdoor pedestrian mall in Israel. See Rubin v. Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003). The District Court for the District of Columbia entered a default judgment in favor of the Rubin defendants under Section 1605(a)(7) of FSIA in an amount totaling $71.5 million in compensatory damages. Having registered the judgment in the Southern District of New York, the Rubin

2

defendants sought to attach and execute against three accounts
held by the Bank of New York on behalf of Bank Melli Iran New
York, Bank Saderat Iran, and Bank Sepah Iran in their attempt to
satisfy the default judgment.[1]

Facing the possibility of multiple claims on the accounts,
the Bank of New York ("BNY") filed an interpleader complaint
seeking to deposit the funds with the Court for a determination
as to the respective rights of the defendants.  Bank Melli filed
this motion to dismiss for lack of subject matter jurisdiction
and failure to state a claim.  Rubin defendants responded by
opposing the motion to dismiss and filing a counterclaim against
BNY seeking turnover of the disputed funds under New York law.[2]

The Rubin defendants base their claim to the funds held by
BNY on the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L.

---

[1] Neither Bank Saderat nor Bank Sepah has entered an
appearance in this action.  As the parties have provided no
reason to distinguish among the Iranian banks, the following
analysis will apply to all of the funds held by the Bank of New
York.  See Weinstein v. Islamic Republic of Iran, 299 F. Supp.
63, 64 n.1 (E.D.N.Y. 2004).

[2] The Rubin defendants' "counterclaim" is not an independent
counterclaim against the stakeholder, but rather a statement of
their claim to the res in contest.  It will therefore be
construed as such.  See U.S. Trust Co. of New York v. Alpert, 10
F. Supp. 2d 290, 307 (S.D.N.Y. 1998) (noting a lack of authority
for "the proposition that the proper commencement of an
interpleader action may in itself give rise to a counterclaim
against the stakeholder for failing, instead, to have paid the
moneys out to the counterclaiming defendant without benefit of
court adjudication of conflicting claims among defendants"),
aff'd sub nom. U.S. Trust Co. of New York v. Jenner, 168 F.3d 630
(2d Cir. 1999); see also 7 Charles Alan Wright, Arthur R. Miller
& Mary Kay Kane, Federal Practice and Procedure § 1715 (3d ed.
2001) ("The usual rules of pleading are applicable to an
interpleader action, as are the principles calling for the
liberal construction of the pleadings and treating mislabeled
pleadings according to their substance.")

No. 107-297, 116 Stat. 2322 (2002). Section 201(a) of the TRIA

authorizes the attachment of certain assets, termed "blocked

assets," for victims of terrorism. The Act provides that

> [n]otwithstanding any other provision of law, and
> except as provided in subsection (b), in every case in
> which a person has obtained a judgment against a
> terrorist party on a claim based upon an act of
> terrorism, or for which a terrorist party is not immune
> under section 1605(a)(7) of title 28, United States
> Code, <u>the blocked assets of that terrorist party</u>
> (including the blocked assets of any agency or
> instrumentality of that terrorist party) <u>shall be
> subject to</u> execution or <u>attachment</u> in aid of execution
> in order to satisfy such judgment to the extent of any
> compensatory damages for which such terrorist party has
> been adjudged liable.

TRIA § 201(a) (emphasis added). "Blocked assets" are in turn

defined as including "any asset seized or frozen by the United

States under . . . sections 202 and 203 of the International

Emergency Economic Powers Act (50 U.S.C. 1701; 1702)." TRIA §

201(d)(2)(A).[3] Explicitly excluded from "blocked assets" is any

> property that[] is subject to a license issued by the
> United States Government for final payment, transfer,
> or disposition by or to a person subject to the
> jurisdiction of the United States in connection with a
> transaction for which the issuance of such license has
> been specifically required by statute other than the
> International Emergency Economic Powers Act (50 U.S.C.
> 1701 et seq.) or the United Nations Participation Act
> of 1945 (22 U.S.C. 287 <u>et seq.</u>)[.]

TRIA § 201(d)(2)(B)(I).


B. Iranian Sanctions Programs

    Acting pursuant to Sections 202 and 203 of the International

---

[3] Blocked assets also include "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b))." TRIA § 201(d)(2)(A). No action taken under this Act is relevant to the present dispute.

Emergency Economic Powers Act, 50 U.S.C. §§ 1701 & 1702, ("IEEPA"), the President has implemented economic sanctions programs against many foreign states, including Iran.  This statute grants the President broad authority to declare a national emergency and subsequently "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit," a variety of interests and transactions involving "any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).

Economic sanctions against Iran began on November 14, 1979, in response to Iran's seizure of the U.S. embassy in Tehran and the resulting hostage crisis.  In an executive order, President Carter declared a national emergency and

> order[ed] blocked all property and interests in
> property of the Government of Iran, its
> instrumentalities and controlled entities and the
> Central Bank of Iran which are or become subject to the
> jurisdiction of the United States or which are in or
> come within the possession or control of persons
> subject to the jurisdiction of the United States.

Exec. Order No. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979).  The President then delegated his authority under IEEPA to the Secretary of the Treasury in order to implement the order.  Id.

Through the Office of Foreign Assets Control ("OFAC"), the Treasury Department issued the Iranian Assets Control Regulations ("IACR") to implement President Carter's order.  45 Fed. Reg.

24,432 (Apr. 9, 1980), codified at 31 C.F.R. Part 535.[4]  Most

significant for the purposes of this case is Section 535.201,

which provides that

> [n]o property subject to the jurisdiction of the United
> States or which is in the possession of or control of
> persons subject to the jurisdiction of the United
> States in which on or after the effective date Iran has
> any interest of any nature whatsoever may be
> transferred, paid, exported, withdrawn or otherwise
> dealt in except as authorized.

31 C.F.R. § 535.201.  According to the Director of OFAC,

approximately $12 billion of Iranian property was blocked as a

result of President Carter's Order.

   The blocking order was followed by a second executive order

explicitly prohibiting the sale, supply or transfer by persons

subject to United States jurisdiction of certain items to Iran,

as well as other specified transactions.  Exec. Order No. 12,205,

45 Fed. Reg. 24,099 (Apr. 7, 1980).  This order was subsequently

amended by a third order.  See Exec. Order 12,211, 45 Fed. Reg.

26,685 (Apr. 17, 1980).

   On January 18, 1981, the United States and Iran resolved the

hostage crisis with the signing of the Algiers Accords.  Under

the Algiers Accords, the United States agreed, inter alia, to

"restore the financial position of Iran, in so far as possible,

to that which existed prior to November 14, 1979."  Declaration

of the Government of the Democratic and Popular Republic of

Algeria (Jan. 19, 1981) ¶ A.  The United States further

---

[4] According to its director, Robert W. Werner, OFAC is the
government office "primarily responsible for the implementation,
administration, and enforcement of multiple U.S. economic
sanctions programs."

"commit[ted] itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction." Id.

In keeping with the agreements expressed in the Algiers Accords, most Iranian assets in the United States were unblocked and the trade embargo was lifted. President Carter explicitly revoked Executive Orders 12,205 and 12,211, see Exec. Order No. 12,282, 46 Fed. Reg. 7925 (Jan. 19, 1981), and OFAC promulgated a general license that "authorized" "[t]ransactions involving property in which Iran or an Iranian entity has an interest" where "[t]he property c[a]m[e] within the jurisdiction of the United States or into the control or possession of any person subject to the jurisdiction of the United States after January 19, 1981." 31 C.F.R. § 535.579(a). This license "has the effect of removing a prohibition or prohibitions in subpart B from the transaction." Id. § 535.502(c). The blocking provision in Section 535.201 is located in subpart B. Accordingly, transactions authorized by the general license would not be blocked by Section 535.201.

Although property entering the United States after January 19, 1981 was not blocked, the blocking provision of Section 535.201 was never repealed. According to OFAC, it remains in place for two reasons: first, some blocked property (primarily diplomatic and consular property) remains in the United States; second, the claims settlement process established under the Algiers Accords has not been completed. Both of these facts require the continuation of the IACR, including provisions to govern the remaining blocked property and to require that blocked

property be made available for the claims process.

Beginning in 1987, new sanctions programs were implemented that severely restricted trade between the United States and Iran, but did not entail any freezing of Iranian assets. On October 29, 1987, President Reagan issued Executive Order 12,613 pursuant to the International Security and Development Cooperation Act, 22 U.S.C. § 2349aa-9 & 3 U.S.C. Title 301 ("ISDCA"). The order prohibited, with certain exceptions, the importation of goods and services from Iran. Exec. Order 12,613, 52 Fed. Reg. 41,940 (Oct. 29, 1987). But it made clear that the measures it introduced were taken in response to actions "occurring after the conclusion of the 1981 Algiers Accords, and are intended solely as a response to those actions." Id. § 5.

In March 1995, President Clinton declared a national emergency under IEEPA with respect to Iran and imposed sanctions prohibiting the entry into or performance of a contract by a United States person related to the development of petroleum resources in Iran. Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995). Then, two months later, President Clinton issued another order expanding the scope of sanctions imposed in both President Reagan's order and his own previous order under authority provided by IEEPA and ISDCA. Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995). Finally, on August 19, 1997, President Clinton clarified and consolidated the provisions of Executive Orders 12,613; 12,957; and 12,959, again under the authority of IEEPA and ISDCA. See Exec. Order 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997). This final order, like the one that

preceded it, specifically indicated that "[t]he measures taken pursuant to this order are in response to actions of the Government of Iran occurring after the conclusion of the 1981 Algiers Accords, and are intended solely as a response to those later actions." Id. § 9.

Pursuant to the executive orders issued by Presidents Reagan and Clinton, OFAC promulgated and then revised the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560. The ITR broadly regulate trade in Iranian goods, services and technology; new investment in Iran; and financial transactions related to both. The ITR establish a regulatory regime completely "separate from, and independent of" the IACR. Id. § 560.101(a). They do not contain a general blocking provision.

C. Bank Melli

Bank Melli has been subject to both sanctions regimes -- the IACR and the ITR -- described above. The Bank has been determined to be owned or controlled by the Government of Iran, see id. Part 560, App. A, and its property was therefore blocked under President Carter's first executive order. See Exec. Order 12,170, supra (blocking property of Iran, its instrumentalities, and controlled entities in the United States). Following the signing of the Algiers Accords, however, the general license issued by OFAC removed the prohibitions that otherwise would have applied under the blocking order to property that came into the United States after January 19, 1981. See 31 C.F.R. § 535.579(a)(1) (authorizing transactions involving property); see

<u>also</u> <u>id.</u> at § 525.502(c) (explaining effect of authorization).
Any funds that came into the Bank after that date were therefore
not blocked.

Following Presidents Reagan's and Clinton's executive
orders, though, the Bank has been subject to significant new
restrictions on its activities in the United States.  The broad
prohibitions in Sections 560.201 and 560.204 of the ITR
effectively prevent the Bank from conducting banking operations
or receiving goods or services from a U.S. person.  <u>See</u> 31 C.F.R.
§§ 560.201 & 560.204.  The funds of Iranian banks held at United
States banks were not seized or frozen, however.  The United
States banks need specific licenses from OFAC to actively manage
such accounts, but they are authorized to maintain the accounts
and post interest to them.  <u>See</u> <u>id.</u> at § 560.517(a) & (a)(1).
Moreover, Iranian account-holders are explicitly authorized to
close their accounts and receive all of their funds in a lump-sum
transfer.  <u>Id.</u> § 560.517(a)(3).

Within the ITR regulatory regime, Bank Melli has received
two specific licenses from OFAC permitting it to engage in
limited banking activities.  First, in 1995, OFAC granted the
Bank a license to fulfill obligations already in existence on
June 6, 1995, as well as to cover overhead expenses.  In March
1996, OFAC issued another license to Bank Melli that required the
Bank to close the accounts authorized by the 1995 license and to
open a new account for payroll and overhead expenses.  The Rubin
defendants allege, and Bank Melli does not dispute, that the Bank
has closed its representative office in New York, and Bank Melli

10

acknowledges that it is trying to close its accounts at BNY.

## DISCUSSION

Rule 22, Fed. R. Civ. P., allows interpleader actions "when [the interpleader-defendants'] claims are such that the plaintiff is or may be exposed to double or multiple liability." Fed. R. Civ. P. 22(1).[5] "Rooted in equity, interpleader is a handy tool to protect a stakeholder from multiple liability and the vexation of defending multiple claims to the same fund." Washington Elec. Co-op., Inc. v. Paterson, Walke & Pratt, P.C., 985 F.2d 677, 679 (2d Cir. 1993). The competing claims need not have a common origin, as long as they are "adverse to and independent of one another." Fed. R. Civ. P. 22(1). Moreover, the availability of interpleader relief does not depend on the merits of the underlying claims against the stakeholder. John Hancock Mut. Life Ins. Co. v. Kraft, 200 F.2d 952, 954 (2d Cir. 1953); Rubinbaum LLP v. Related Corporate Partners V, LP, 154 F. Supp. 2d 481, 486 (S.D.N.Y. 2001). Rather, "what triggers interpleader is a real and reasonable fear of double liability or vexatious,

---

[5] Rule 22 "does not provide an independent basis for jurisdiction." Correspondent Servs. Corp. v. First Equities Corp. of Fla., 338 F.3d 119, 124 (2d Cir. 2003). Jurisdiction over this action is conferred by 28 U.S.C. § 1331 because a coercive action by the Rubin defendants would have presented a federal question. See Commercial Union Ins. Co. v. United States, 999 F.2d 581, 585 (D.C. Cir. 1993); CPS Elec., Ltd. v. United States, 166 F. Supp. 2d 727, 729 (N.D.N.Y. 2001); Salomon Smith Barney, Inc. v. McDonnell, 201 F.R.D. 297, 303 (S.D.N.Y. 2001).

11

conflicting claims." <u>Washington Elec.</u>, 985 F.2d at 679 (citation omitted).

An interpleader action is normally conducted in two stages: the first to determine whether the stakeholder is entitled to bring the action, and the second to determine the rights of the competing claimants to the fund. <u>Avant Petroleum, Inc. v. Banque Paribas</u>, 853 F.2d 140, 143 (2d Cir. 1988). "[T]his bifurcation is not mandatory, however, and the entire action may be disposed of at one time." <u>N.Y. Life Ins. Co. v. Ct. Dev. Auth.</u>, 700 F.2d 91, 95 (2d Cir. 1983).

Bank Melli moves to dismiss the interpleader complaint on the grounds that the Rubin defendants are not entitled to the funds under the TRIA and that they are collaterally estopped from making a claim. These reasons would not justify the denial of interpleader relief to BNY. Indeed, the fact that Bank Melli disputes the Rubin defendants' claims to the funds is sufficient in itself to justify interpleader relief. <u>See</u> <u>Washington Elec.</u>, 985 F.2d at 679 (explaining that an interpleader action is properly "trigger[ed]" by "fear of . . . conflicting claims"); <u>Hancock Mut.</u>, 200 F.2d at 953 ("The stakeholder should not be obliged at its peril to determine which of two claimants has the better claim."). For "it cannot be said here that the [Rubin defendants'] claim is so utterly baseless that the stakeholder's . . . assertion of multiple claims is not made in good faith." <u>Stuyvesant Ins. Co. v. Dean Const. Co.</u>, 254 F. Supp. 102, 108 (S.D.N.Y. 1966) (citation omitted); <u>see also</u> 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and</u>

Procedure § 1704 (3d ed. 2001) ("[I]t is immaterial whether the stakeholder believes that all claims against the fund are meritorious. Indeed, in the usual case, at least one of the claims will be quite tenuous.").

Yet while the substance of Bank Melli's motion papers are not truly responsive to the propriety of interpleader relief, they do clearly set out the Bank's position on the rights of the competing claimants to the funds. Moreover, at the initial conference in this action, all parties expressed a shared understanding that a ruling on this motion would resolve the dispute between these interpleader-defendants. The motion to dismiss will therefore be recharacterized as a motion for judgment on the pleadings of the adverse action between the claimants to the stake. See United States v. Rivera, 376 F.3d 86, 92 (2d Cir. 2004) ("The court is not required to accept labels the parties place on their motions if those characterizations are inapt.") (citation omitted); see also 7 Wright, Miller, & Kane, supra, § 1715 (noting that "[c]onflicting claims to the fund can be adjudicated on the pleadings").

For the reasons set out in Weinstein v. Islamic Republic of Iran, 299 F. Supp. 2d 63 (E.D.N.Y. 2004), Bank Melli is correct that its funds held at BNY are not blocked by the IACR. The opinion by the Honorable Judge Leonard D. Wexler in Weinstein contains a thorough and considered analysis of the regulatory regimes described above in a factual context essentially identical to the present action. Moreover, the interpretation of the relevant regulations offered by the court in Weinstein is

13

consistent with the interpretation set forth by Robert Werner,
the Director of OFAC, in a declaration submitted to this Court.
"Since OFAC was the agency charged with administering the
Regulations, its views are entitled to substantial deference."
United States v. Hescorp, Heavy Equip. Sales Corp., 801 F.2d 70,
76 (2d Cir. 1986).  This is especially true where OFAC developed
the regulations at issue.  Id.  There is no reason to depart from
the conclusions adopted by both the Weinstein court and the
Government that the funds held by Bank Melli at BNY are not
blocked by the IACR and therefore not seized or frozen for the
purposes of the TRIA.[6]

The Rubin defendants present several arguments why Weinstein
should not be followed.  This Opinion will address only those
arguments not previously rejected by Judge Wexler.  Their lead
argument is that Weinstein contradicts the Supreme Court's
holding in Regan v. Wald, 468 U.S. 222 (1984).  The Rubin
defendants read Regan for the proposition that once an action has
been prohibited as part of a sanctions program, a general license
authorizing that action does not change the underlying
(prohibited) status of the action.

Regan concerned regulations governing travel to Cuba
originally promulgated under the Trading with the Enemy Act of
1911 ("TWEA"), 40 Stat. 411, as amended, 50 U.S.C. App. § 1 et
seq.  To briefly summarize, a Treasury Department regulation
issued in 1963, 31 C.F.R. § 515.201(b) ("Regulation 201(b)"),

---

[6] The United States has submitted a Statement of Interest in
this case pursuant to 28 U.S.C. § 517.

prohibited all transactions involving property in which Cuba or a Cuban national had an interest.  In 1977, a new regulation, 31 C.F.R. § 515.560 ("Regulation 560"), provided a general license authorizing travel-related economic transactions in Cuba. Finally, in 1982, Regulation 560 was amended to curtail the general license for travel-related transactions.

The issue before the Court in Regan concerned the President's authority under a grandfather clause passed along with IEEPA to regulate transactions with Cuba without following the procedures outlined in the new Act.  The Court found that the President did have the authority to amend Regulation 560 because the regulation reflected an ongoing exercise of his power to regulate transactions with Cuba (the grandfather clause preserved those authorities being exercised on July 1, 1977). Significantly, the exercise of authority that the Court identified was the authorization of travel-related transactions in Regulation 560, not the ongoing prohibition of such transactions that the Rubin defendants would locate in Regulation 201(b).  See Regan, 468 U.S. at 234.

Consequently, the Court did not hold, as the Rubin defendants suggest, that travel-related transactions with Cuba were prohibited by Regulation 201(b) at the same time that they were licensed by Regulation 560.  On the contrary, the Court was clear that following the issuance of Regulation 560, travel-related economic transactions were "exempted . . . from the categorical prohibition of Regulation 201(b)."  Regan, 468 U.S. at 234.  Only when the license was amended did travel

15

transactions "bec[o]me subject, <u>once again</u>, to the prohibition of Regulation 201(b)." <u>Id.</u> (emphasis added).

Yet even if the Rubin defendants correctly read <u>Regan</u>, there is a highly significant factual distinction between the general license in that case and the one at issue here. The license in Regulation 560 "was expressly subject to revocation, amendment, or modification at any time." <u>Id.</u> (construing 31 C.F.R. § 515.805). The general license in the IACR, on the other hand, "has the effect of removing" the blocking prohibition in Section 535.201. 31 C.F.R. § 535.502(c). This license cannot reasonably be read as temporarily permitting transactions involving blocked assets, for it expressly provides that the subject assets are not blocked.

Finally, even assuming <u>arguendo</u> that the Rubin defendants were correct and that <u>Regan</u> meant that Bank Melli's funds were still blocked by the IACR, this still would not be enough to entitle the Rubin defendants to the disputed funds. TRIA defines the "blocked assets" that a terrorism victim may attach as "any asset[s] <u>seized or frozen</u> by the United States under . . . sections 202 and 203 or [IEEPA]." TRIA § 201(d)(2)(A) (emphasis added). Bank Melli retains the right, explicitly recognized in the ITR, to close its account and receive a lump-sum transfer of its assets. 31 C.F.R. § 560.517(a)(3). Given this right, its funds cannot accurately be described as either seized or frozen by the United States and consequently do not fall within the definition of "blocked assets" provided in the TRIA. <u>See</u> <u>Weinstein</u>, 299 F. Supp. at 75 ("Given that not every type of

action authorized by the IEEPA necessarily involves a seizing or freezing of property, it follows that not every action regarding property under the authority of the IEEPA . . . results in the property being 'blocked' under the TRIA.").

The Rubin defendants next argue that the holding in Weinstein is contrary to the Treasury Department's policy and practices with respect to other sanctions programs. Regardless of what the Treasury Department might do in these other programs, Weinstein's interpretation of the regulations governing the Iran sanctions is sound. Furthermore, the Rubin defendants' invocation of these other licenses (not to mention metaphysics) to support their assertion that assets can be theoretically blocked and licensed at the same time is utterly beside the point. As Weinstein held, and as is evident from the plain language of the IACR, the funds at issue in this case were never blocked. See Weinstein, 299 F. Supp. 2d at 74; 31 C.F.R. § 535.502(c) & 535.579; see also Werner Decl. (explaining that "any accounts that the Iranian banks established after January 19, 1981, or funds credited to their accounts after January 19, 1981, were not blocked").

Finally, the Rubin defendants argue that the logic of Weinstein no longer applies to the funds subject to this action because the "licensed status of the funds appears to have changed." The alleged change is that the Bank Melli Representative Office in the United States appears to have closed. If this is so, the Rubin defendants suggest, then the 1996 license that authorized the opening of the account at BNY

17

for the payment of overhead expenses is "presumptively expired" and the funds in the account revert to a blocked status.

This argument is also foreclosed by the plain language of the regulations. The ITR, which govern the maintenance of accounts held by Iranian banks at United States institutions, explicitly preserve the right of Iranian banks to close their accounts at United States banks and receive a lump-sum transfer of their assets. 31 C.F.R. § 560.517. Neither the license nor the ITR forces an Iranian institution to maintain a representative office under penalty of forfeiting assets held in United States banks. As no action has been taken by the United States Government to seize or freeze the disputed funds since <u>Weinstein</u> was decided, there has been no change in the status of those funds that would make that decision less relevant or appropriately applied to this action.


<u>CONCLUSION</u>

Bank Melli's recharacterized motion for judgment on the pleadings is granted. For the reasons stated in <u>Weinstein</u> and discussed above, those funds are not blocked for the purposes of the TRIA and may not be attached by the Rubin defendants. As the Rubin defendants have no right to the contested funds under the TRIA, their restraining orders must be, and hereby are, vacated.

The Bank of New York may release the funds to Bank Melli.

    SO ORDERED:

Dated:    New York, New York
          March 15, 2006

                            _____
                              DENISE COTE
                  United States District Judge